IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

|  |  |  |
|---|---|---|
| IN RE | ) ) ) | |
| CAMERON-811 RUSK, L.P., | ) ) | CASE NO. 10-31856-H3-11 |
| Debtor, | ) ) ) | |

## MEMORANDUM OPINION

The court has held an evidentiary hearing on the "Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)" (Docket No. 52) filed by "Wells Fargo Bank, N.A., successor-by-merger to Wachovia Bank, National Association and/or special purpose corporation Redus TX Properties, LLC, or their successors and assigns."[1]  The following are the Findings of Fact and Conclusions of Law of the court.  A separate conforming Judgment will be entered.  To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such.  To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

### Findings of Fact

Cameron-811 Rusk, L.P. ("Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on March 2, 2010.

---

[1] The entities described in the motion are referred to in this opinion as "Wells Fargo."

In the instant motion, Wells Fargo seeks lifting of the automatic stay, in order to foreclose Debtor's interest in its single asset real estate, the 18-story Houston Club building located at 811 Rusk, in the central business district of Houston, Texas. Wells Fargo seeks relief under Section 362(d)(1) of the Bankruptcy Code, for cause; Section 362(d)(2) of the Bankruptcy Code, for lack of equity and absence of necessity for an effective reorganization; and Section 362(d)(3) for failure of Debtor's compliance with single asset real estate provisions. Debtor denies the material allegations of the motion.

Debtor purchased the property on March 1, 2007, for $14,850,000. In connection with the purchase, Debtor executed, in favor of Wachovia, Wells Fargo's predecessor, a promissory note in the original principal amount of $12 million, and a deed of trust with respect to Debtor's interest in the property. The initial note provided for a maturity date of March 1, 2008, and interest-only payments prior to its maturity, at an interest rate of the one month LIBOR rate plus 1.9%. (Wells Fargo Exhibit Nos. 2, 3).

On January 30, 2008, Debtor borrowed an additional $3.5 million from Wells Fargo. Debtor executed an additional note and deed of trust with respect to the property. (Wells Fargo Exhibit Nos. 5, 6). The second note provided for a maturity date of August 1, 2008, and interest-only payments prior to its maturity,

at an interest rate of the one month LIBOR rate plus 2.05%.

Roy Simone, a vice president with Wells Fargo, testified that Debtor borrowed the $3.5 million because the property was not generating sufficient cash flow to enable Debtor to service the $12 million debt.  He testified that Wells Fargo put the $3.5 million aside, and drew against the loan proceeds to pay the debt service.

On August 22, 2008, effective as of August 1, 2008, Debtor and Wells Fargo executed a modification agreement, under which, inter alia, the maturity of both the $12 million note and the $3.5 million note were extended to August 1, 2009, and the interest rate was adjusted to the one month LIBOR rate plus 2.6%. (Wells Fargo Exhibit 7).

Simone testified that the loans matured in August, 2009, and remained unpaid after August, 2009.

At the hearing on the instant motion, the parties presented a written stipulation that, as of March 2, 2010, the date of filing of the petition in the instant Chapter 11 case, Debtor owed Wells Fargo $15,328,999.23 in unpaid principal, $183,618.52 in accrued but unpaid interest, plus expenses of $14,175.00, in addition to any and all related fees, costs, obligations, and liabilities associated with the loan documents.

Dougal Cameron testified in opposition to the instant motion.  Cameron testified that he is the majority owner of

3

Cameron Interests, L.P. ("CILP").  He testified that both he and CILP are limited partners in Debtor, and that CILP owns Debtor's general partner.

Cameron testified that Debtor's building occupies a city block in downtown Houston, Texas.  The basement of the building is connected to downtown Houston's pedestrian tunnel system.  In the basement, there are retail spaces presently occupied by restaurants and shops.  On the ground level, the building is occupied by a lobby, storage space, restaurants and shops.  On the second through sixth levels, the building has a parking garage.  The seventh through tenth levels are presently occupied by the Houston Club, a private club.  The seventh through tenth levels also have approximately 46,000 square feet of space (the "Annex Space") presently deemed unusable.  The twelfth, fourteenth, fifteenth, sixteenth, and eighteenth levels are presently occupied by El Paso Corporation ("El Paso").  The eleventh level is vacant, except for short term tenants and the rent-free office of CILP.  The thirteenth level is occupied by short-term tenants.  The seventeenth level is occupied by two long-term tenants and a charitable organization.

Christine Gabriel, an employee of CILP, testified that Debtor made payments of interest at the non-default contract rate to Wells Fargo, for April, 2010 during late May, 2010, and for May, 2010 in early June, 2010.

Wells Fargo and Debtor each presented an appraiser to value the building. Curtis Podlewski, Wells Fargo's appraiser, testified that, after considering cost, sales comparison, and income approaches, he estimates the value of the building to be $11,750,000. Gerald A. Teel, Debtor's appraiser, testified that, after considering sales comparison and income approaches, he estimates the value of the building to be $16,600,000. Both Podlewski and Teel acknowledged that market rental rates for office space in the central business district have been declining, and that the values of buildings have declined accordingly.[2]

The principal difference between the Podlewski appraisal and the Teel appraisal is their treatment of the Annex Space. Podlewski's appraisal report is based on a net rentable space in the building of 302,137 square feet. (Wells Fargo Exhibit 18). Teel's appraisal report is based on a net rentable space in the building of 348,429 square feet. (Debtor's Exhibit 22).

The Houston Club occupies approximately 112,636 square feet in the building. El Paso occupies approximately 93,428 square feet in the building. (Debtor's Exhibit 1).

---

[2]The court notes that Cameron also testified that the building was worth "a lot more money" when Debtor purchased it than on the date of the hearing on the instant motion.

El Paso's lease terminates on January 31, 2011, and it has provisions which would permit early termination as to portions of the leased space on August 31, 2010 and September 30, 2010, respectively. (Wells Fargo Exhibit 32). Simone testified that El Paso executed the lease in order to provide it with temporary space while it renovates its headquarters building in downtown Houston, Texas.

Both Podlewski and Teel testified that the Annex Space is presently unusable. The Annex Space is located adjacent to the Houston Club. Teel testified that, under the Houston Club lease, the Houston Club pays rent of $1.38 per square foot, and does not reimburse Debtor for chilled water and steam to heat and cool the space.[3] The Houston Club lease expires during 2015.

Cameron testified regarding Debtor's business plan for the use of the building. He testified that Debtor anticipates that El Paso will renew its lease. In the alternative, Cameron testified that he has made presentations to the Houston Independent School District ("HISD") and the Kipp Academy,

---

[3]Teel's appraisal report indicates that an appropriate market rate of annual rent for a triple net lease (in which the lessee pays rent, plus taxes, insurance, and maintenance expenses) of an office building in the Houston central business district is $12.00 per square foot. (Debtor's Exhibit 22, at p. 57). Podlewski's appraisal report indicates that an appropriate market rate of annual rent for a triple net lease of an office building in the Houston central business district is $11.00 per square foot. (Wells Fargo Exhibit 18, at p. 59). Debtor's lease with the Houston Club is not in evidence.

directed toward encouraging them to lease the space presently occupied by El Paso for use as a school.

Cameron testified that, if HISD occupies the space presently occupied by El Paso, the space would require an investment of $40-50 million to renovate the space for use as a school. He testified that Debtor is unable to provide the funding for such a renovation. He testified that he has communicated with personnel of several endowments and foundations seeking commitments for funding for such a renovation. He testified that he does not have a tangible agreement with either HISD or Kipp Academy.

Cameron testified that Debtor anticipates rejecting the Houston Club lease, in order to attempt to force the Houston Club to negotiate a new lease at market rates and/or pay for chilled water and steam.[4] He testified that he has proposed several options to the Houston Club, including moving the Houston Club to the top two levels of the building, allowing the Houston Club to retain the ninth and tenth levels and surrender the seventh and eighth levels, and providing a "bargain" rent to the Houston Club for a new 25 year lease, but requiring that the Houston Club pay for its own renovations of the space.

Cameron testified that, upon the expiration of the

---

[4]This option supposes that the Houston Club would remain in possession pursuant to Section 365(h)(1)(A)(ii) of the Bankruptcy Code.

7

Houston Club lease in 2015, he anticipates the need for additional capital, in order to renovate the space presently occupied by the Houston Club, and the Annex Space, for lease to tenants. He testified that he anticipates conversion of the seventh level to additional parking spaces. He testified that renovation of the space occupied by the Houston Club and the Annex Space would require asbestos abatement, removal of existing debris and mechanical systems from the space, and construction of new tenant improvements. Cameron estimates a cost of $60-100 per square foot to renovate the Annex Space to a condition similar to that of the Houston Club.

   Cameron testified that two tenants on the ground floor, Burger King and Hunan Restaurant, are in arrears for rent. He testified that the arrearage was approximately $229,000 on the petition date, and had increased to approximately $281,000 by the end of April, 2010. He testified that Debtor has determined that the rest of the building is better served by allowing those two tenants to remain in the rented spaces, despite their nonpayment of rent, because it would look bad from the street for those spaces to be dark. He testified that, although Burger King is in arrears, it is paying its current rent. He testified that Hunan has been in default since before Debtor bought the building.

   Cameron testified that, since Debtor has owned the building, Debtor has made improvements to the building. He

testified that Debtor has identified and repaired leaks and replaced equipment in the plumbing, heating, ventilation, and air conditioning systems, and improved the electrical system.  He testified that the improvements have reduced Debtor's operating expenses significantly.

Podlewski testified that he excluded the annex space from his consideration of the value of the building, because if the space were renovated, it would become available at the same time as a large volume of space would become available when the Houston Club lease expires, and thus would be difficult to lease.

Teel testified that his model of the income stream of the building included the annex space, with one-fourth of the space becoming available in January 2016, one-fourth in July, 2016, one-fourth in January, 2017, and one-fourth in July, 2017.  He testified that his cash flow model included expenses of $50 per square foot to improve the space, including both the Houston Club space and the Annex Space.

On June 15, 2010, two days before the hearing on the instant motion commenced, Debtor filed its first amended disclosure statement and plan.  (Docket Nos. 82, 83).  Under the first amended plan, Debtor proposes to pay Wells Fargo interest-only, at an interest rate of 4%, for 59 months, with a balloon payment due in the 60th month after the effective date of the plan.  The plan provides for the cancellation of the prepetition

equity interests of Debtor's general partner and limited partners, and provides that the equity in the reorganized Debtor will be owned by the new general partner (identified in the plan as the same entity, Cameron-811 Rusk GP, L.L.C. as the entity that is the prepetition general partner) and the new limited partners who make a capital contribution.  The plan provides that Cameron-811 Rusk GP, L.L.C. will manage the Debtor, and CILP will manage the building pursuant to a management agreement.

Cameron testified that the prepetition limited partners were unwilling to make capital contributions unless non-contributing partners forfeited their interests.  He testified that, after Wells Fargo sued him in his individual capacity, the limited partners were unwilling to make further capital contributions prepetition.

The plan does not identify the amount of contribution sought from the new limited partners under the proposed plan. Cameron testified that an amount of $1.5 million will be sought. He testified that Debtor needs $500,000 for immediate repair of the elevators in the building, $500,000 for working capital, and $500,000 for contingencies.  He testified that there is no subscription agreement for contribution of the $1.5 million. He testified that if the $1.5 million is not contributed, the plan will fail.

Conclusions of Law

Section 362(d) of the Bankruptcy Code provides in pertinent part:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> >
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if-
> >
> > > (A) the debtor does not have an equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization;
> >
> > (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later--
> >
> > > (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

11

>> (B) the debtor has commenced monthly payments that--
>>
>>> (i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and
>>>
>>> (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate.

11 U.S.C. § 362(d).

> Section 362(g) of the Bankruptcy Code provides:
>
> (g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section--
>
>> (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
>>
>> (2) the party opposing such relief has the burden of proof on all other issues.

11 U.S.C. § 362(g).

The provisions of Section 362(d)(3) are separated by the word "or," and thus are read disjunctively. In the instant case, Debtor has commenced making payments in an amount equal to interest at the nondefault contract rate. Thus, the stay does not lift under Section 362(d)(3).

"Equity" as used in Section 362(d)(2) means the difference between the value of the subject property and the encumbrances against it.  Matter of Sutton, 904 F.2d 327 (5th Cir. 1990).

In the instant case, the parties have stipulated to a debt amount of $15,526,792.75.  The court has considered the appraisal reports and testimony of Podlewski and Teel, as well as the testimony of Cameron.  It is clear from the testimony of Podlewski and Teel that market rental rates and the values of buildings in the central business district have been declining.  It is clear from the testimony of Cameron that he has made improvements which have made a positive difference in the net operating income of the building, and thus on the value.  Podlewski's appraisal report omits any value for the Annex Space.  Teel's appraisal report includes the Annex Space as usable space, and provides that it will be fully absorbed in the marketplace over the course of two years, at a time when the 112,636 presently occupied by the Houston Club is anticipated to be on the market.  Moreover, Teel's appraisal report does not provide for the $60-100 per square foot that Cameron testified is necessary for renovation of the Annex Space.  Neither Podlewski's appraisal report nor Teel's appraisal report sufficiently determines a market value for the property, in light of the omission of the Annex Space from Podlewski's appraisal report,

13

and a value in Teel's appraisal report based on unsupported assumptions that both the Annex Space and the Houston Club space can be absorbed in a short period of time and that the cost of renovation of the space will be $50 per square foot.  Although the court does not fix a value of the property, the court believes that the value is less than $15,526,792.75, the amount of the debt.

The question of whether a property is necessary to an effective reorganization depends, in the first instance, on whether the Debtor can show a reasonable prospect for a successful reorganization within a reasonable time.  The debtor must do more than manifest unsubstantiated hopes for a successful reorganization.  <u>In re Canal Place L.P.</u>, 921 F.2d 569 (5th Cir. 1991).

In the instant case, Debtor's prospects for a successful reorganization (without even addressing whether Debtor's current plan or a similar plan might meet the standards for confirmation) depend on unreasonable short-term and long-term assumptions.  In order for Debtor to succeed, Debtor must retain El Paso as a tenant, despite the temporary nature of its lease, or quickly replace it.  Debtor must obtain the capital contributions of partners who have previously refused to contribute.  Debtor must succeed in its negotiations with the Houston Club for a revised arrangement during the remaining term

of the Houston Club lease.  There is insufficient proof of Debtor's ability to accomplish any of these things, and Debtor's reorganization depends on all of these things.  Debtor's repayment of the principal of Wells Fargo's note depends on its successful renovation of the building, for either the Houston Club or another tenant, and for which there is no realistic provision making capital available.  The court takes into consideration the fact that the Debtor bought the property three years before the date of filing of the instant Chapter 11 case, and has never had sufficient cash flow to pay its operating expenses and service the debt.  The court concludes that Debtor lacks equity in the property.  The court concludes that, because Debtor has not shown a reasonable prospect for a successful reorganization within a reasonable time, that the property is not necessary to an effective reorganization.

What constitutes "cause" for the lifting of the stay pursuant to Section 362(d)(1) is not defined in the Bankruptcy Code.  Whether cause exists must be determined on a case by case basis based on an examination of the totality of circumstances.  In re Reitnauer, 152 F.3d 341, 343 n. 4 (5th Cir. 1998); In re Mendoza, 111 F.3d 1264 (5th Cir. 1997).

The determination of cause pursuant to Section 362(d)(1) with respect to a single asset real estate case is independent of the question of whether the stay lifts under

15

Section 362(d)(3).  In re Sterling Development, Inc., 2009 WL 196250 (Bankr. D.N.M. 2009), citing In re Pacific Rim Investments, LLP, 243 B.R. 768 (D. Colo. 2000).

In the instant case, Debtor has not made an affirmative offer of adequate protection.  Wells Fargo asserts, in the instant motion, that it is not adequately protected.  Debtor denies the assertion, leaving the court to consider, on the evidence presented, whether Wells Fargo is adequately protected.  The court has previously concluded that Debtor lacks equity in the property.  Thus, there is no equity cushion that could provide adequate protection.  The evidence is that real property values are declining in the central business district of Houston, Texas.  Debtor is making payments of interest, but not making any payments of principal.  Debtor has proposed a plan calling for Debtor to continue making payments of interest, but not to make any payment of principal for five years, at which time it proposes to pay the loan in full.  Nothing in Debtor's evidence indicates a present or future ability to make payments of principal, or to make the balloon payment called for in the plan.[5]  Debtor's plan depends on $1.5 million in capital contributions that appear unreasonably small for the renovations required to make the building profitable.  Debtor's plan depends

---

[5] The court notes that, even in Teel's appraisal report, the report most favorable to Debtor's position, Debtor's cash flow does not generate a positive return until 2019, after the Annex Space is leased.

on third parties providing additional financial support for the renovation contemplated, yet Debtor has not met its burden of proof that Debtor is likely to receive such support.  The court concludes that the stay should be lifted, for cause, pursuant to Section 362(d)(1) of the Bankruptcy Code.

Based on the foregoing, a separate Judgment will be entered granting the "Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)" (Docket No. 52) filed by Wells Fargo Bank, N.A., successor-by-merger to Wachovia Bank, National Association and/or special purpose corporation Redus TX Properties, LLC, or their successors and assigns.

Signed at Houston, Texas on July 12, 2010.

_____
LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE